CLERK'S OFFICE
A TRUE COPY
May 09, 2024
/s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

❏ Original    ❏ Duplicate

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>Information about the location of the cellular telephone )<br>assigned call number (262) 301-1034 )<br>("TARGET CELL PHONE") ) | Case No.  24-M-402 (SCD)<br>**Matter No.: 2023R00366** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____5-23-24_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Stephen C. Dries_____ .
*(United States Magistrate Judge)*

☒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ☒ until, the facts justifying, the later specific date of _____11/05/2024_____ .

Date and time issued:    _____5-9-24. 10:00 am_____         *Stephen C. Dries*
                                                                                                *Judge's signature*

City and state:    _____Milwaukee, Wisconsin_____         Hon. Stephen C. Dries, U.S. Magistrate Judge
                                                                                                *Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.   Records and information associated with the cellular device assigned call number **(262) 301-1034** (referred to herein and in Attachment B as "**Target Cell Phone**"), LUCIA RODRIGUEZ at 2626 Maple Grove Ave, Racine , Wisconsin (WI) 53404, known to be used by ARMANDO HURTADO, that is in the custody or control of Verizon Wireless, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, New Jersey (NJ) 07921.

2.   **The Target Cell Phone**.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period January 1, 2024, to the present:

i.      Names (including subscriber names, usernames, and screen names);

ii.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.      Local and long-distance telephone connection records;

iv.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.      Length of service (including start date) and types of service utilized;

vi.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period July 1, 2023, to the present including:

    a.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b.    Information associated with each communication to and from the Target Cell Phone for a period of **30** days from the date of this warrant, including:

    i.    Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii.    Source and destination telephone numbers;

    iii.    Date, time, and duration of communication; and

    iv.    All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c.    Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

    i.    To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location

Information to the government.  In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.     This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b), involving ARMANDO HURTADO and other unknown persons prospectively for a period of 30 days from the date of this warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

CLERK'S OFFICE
A TRUE COPY
May 09, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 24-M-402 (SCD)
Information about the location of the cellular telephone )  **Matter No.: 2023R00366**
assigned call number (262) 301-1034 )
("TARGET CELL PHONE") )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), 846 & 843(b) | Distribution of a Controlled Substance, Conspiracy to Distribute a Controlled Substance, and Unlawful Use of a Communication Facility |

The application is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

☑ Delayed notice of ~~90~~ 180 days *(give exact ending date if more than 30 days:* 11/05/2024 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Phillip Jackling, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date: _____5-9-24_____

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin       Hon. Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A SEARCH WARRANT**

**Matter No.: 2024R00366**

I, Phillip Jackling, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(262) 301-1034** (the "**Target Cell Phone**"), which is subscribed to LUCIA RODRIGUEZ (RODRIGUEZ) at 2626 Maple Grove Ave, Racine, Wisconsin (WI) 53404 and known to be used by ARMANDO HURTADO (HURTADO), and whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey (NJ) 07921. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am a sworn federal law enforcement officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses pursuant to Titles 18 and 21 of the United States Code. I have been employed as a Special Agent with the FBI since September 2022, and I am currently assigned to the Milwaukee Field Office. I have been involved in the

enforcement and investigation of violations of federal law, to include drug trafficking investigations and firearm trafficking investigations. I have participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit narcotics and firearms transactions in violation of federal law. I have used investigative techniques including, but not limited to, consensual monitoring, physical surveillance, witness and subject interviews, review and analysis of telephone records, and participated in the execution of search and arrest warrants. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

4.    I graduated from the FBI Academy, Basic Field Training Course ("BFTC"), in February 2023. The Academy was nineteen weeks in duration and covered all aspects of investigating federal crimes. Among other subjects, I received training on surveillance and counter-surveillance operations, counter-terrorism investigations, counter-intelligence operations, use of undercover employees, CHS operations, criminal law, and investigations involving federal electronic surveillance statutes, to include Title III wiretaps, drug identification, search warrant executions, and vehicle stops.

5.     Prior to becoming an FBI Special Agent, I was employed as a police officer for two years with the city of Grapevine, Texas.  I received training, and obtained experience, in the investigation of violations of the Texas state criminal and traffic statutes, to include drug-related and violent crimes.

6.    I attended Saint Bonaventure University and graduated with a Bachelor of Arts degree in International Relations in 2016.

7.     The facts in this affidavit come from case agents' observations, training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my or case agents' knowledge about this matter.

8.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

9.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846 (conspiracy to distribute and possess with intent to distribute controlled substances), 841(a)(1) (distribution of controlled substances), and 843(b) (use of communication facilities to facilitate narcotics trafficking) have been committed, are being committed, or will be committed by HURTADO, and others.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

10.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

11.     The Federal Bureau of Investigation (FBI) is investigating allegations that members of the HURTADO Drug Trafficking Organization, to include HURTADO, are conspiring with each other, and other individuals yet unknown, to transport and distribute

controlled substances, namely cocaine and fentanyl in Racine, WI. The investigation has revealed that HURTADO is believed to reside in Racine, WI and that he has used the **Target Cell Phone** in furtherance of drug-trafficking activity.

12.     On February 23, 2024, case agents met with Confidential Source 1[1] (CS-1) who identified HURTADO as CS-1's source of supply for cocaine. CS-1 stated that HURTADO would sell CS-1 between four to six ounces of cocaine on a weekly basis and would sometimes provide CS-1 cocaine on consignment.

13.     Between February 23, 2024, and February 27, 2024, at the direction of FBI, in unrecorded calls, CS-1 communicated with Hurtado via Facetime using the **Target Cell Phone**. CS-1 stated Hurtado preferred to communicate with him/her via Facetime to know where CS-1 was located when they spoke to each other. CS-1 agreed to purchase nine ounces of cocaine from Hurtado for $7,200 United States Currency (U.S.C.). CS-1 and HURTADO agreed to meet on February 28, 2024, to conduct the cocaine transaction.

**February 28, 2024, Controlled Narcotics Purchase from HURTADO**

14.     On February 28, 2024, CS-1 sent a text message to HURTADO, using the **Target Cell Phone**, at the direction of law enforcement, which stated, "Yo." HURTADO, said, "Yo." CS-1 said, "Be ready for you in a minute." CS-1 was reaching out to HURTADO to make sure HURTADO was still available to sell the nine ounces of cocaine to CS-1.

15.     On February 28, 2024, at approximately 12:29 p.m., HURTADO, using the **Target Cell Phone**, called CS-1 to give him/her directions to the location where they would conduct the

---

[1] CS-1 began working as a confidential human source for the FBI in approximately February 2024. CS-1 has not received any monetary compensation for his/her cooperation with the FBI. CS-1 is cooperating in exchange for consideration on pending state cases. CS-1 is considered reliable and credible, and certain information provided by CS-1 has been corroborated from external sources, including consensually recorded audio and visual recordings, a controlled purchase, and law enforcement databases. CS-1 is a convicted felon and has a criminal history that includes Possess w/intent-cocaine, Recklessly Endangering Safety, Vehicle Operator Flee/Elude, and Resisting or obstructing a police officer.

cocaine transaction. Specifically, HURTADO said, "Yo," and asked, "Can you meet me on the south?" CS-1 asked, "Where on the south?" HURTADO said, "Okay you, okay you know how you go down Racine Street right, you take a right on the Dekoven, and then you take a left on that first street, it's called Clark Street." CS-1 said, "So…" HURTADO said, "You know, it's like, like, the address is 2011 Clark Street." This communication was both audio and video recorded by law enforcement. According to CS-1, Lucia RODRIGUEZ is HURTADO's girlfriend. The location where HURTADO directed CS-1 to meet him to conduct the cocaine transaction, i.e., 2011 Clark Street, Racine, WI is RODRIGUEZ's listed residence.

16.     CS-1 arrived at 2011 Clark Street, Racine, WI and at approximately 12:49 p.m. and a white in color GMC Sierra Denali pickup truck, WI license plate TK2745, parked behind CS-1. HURTADO was in the front passenger seat of the vehicle and a female, believed to be Lucia RODRIGUEZ, was driving. HURTADO got out of the vehicle and entered CS-1's vehicle. From video surveillance, law enforcement believed HURTADO had what appeared to be a bag of cocaine in his hand. RODRIGUEZ then left the area in the vehicle HURTADO arrived to meet CS-1 in. The GMC Sierra Denali, WI license plate TK2745 is registered to RODRIGUEZ.

17.     While in CS-1's vehicle, HURTADO, using the **Target Cell Phone**, placed a Facetime call to Alejandro MARTINEZ[2]. MARTINEZ said, "Yo." HURTADO said, "Make sure you bring a cup." MARTINEZ said, "Oh, okay, I got you." HURTADO said, "And bring like another bag too." MARTINEZ said, "Okay." HURTADO said, "Alright." Case agents believe

---

[2] Law Enforcement has identified Alejandro MARTINEZ as the user of telephone number 262-321-8818 through toll record analysis, law enforcement databases, and Grand Jury Subpoena returns. MARTINEZ is the nephew of Lucia RODRIGUEZ.

MARTINEZ was grabbing the nine ounces of cocaine from a stash location. Case agents further believe HURTADO was instructing MARTINEZ to conceal the cocaine in a cup.

18.     HURTADO told CS-1, "For this one just give me, just give me fifty…fifty-one, I think it comes to like five-sixty a zip [a "zip" is a street term for one ounce of cocaine] or something. Why they trippin my nigga, how much is that?" CS-1 handed HURTADO $7,200 U.S.C. in pre-recorded buy money.

19.     While in the car, HURTADO, using the **Target Cell Phone**, received a telephone call on speakerphone. During the call, HURTADO said, "Que Pasa? I can't hear you. MARTINEZ said, "Oh shit my bad." HURTADO said, "Yeah." MARTINEZ responded in Spanish, HURTADO asked, "What?" MARTINEZ said, "There's a detective over here, this nigga's following me, following her I think." HURTADO told CS-1, "Wait up, go over there, wait up, wait up." MARTINEZ said, "Okay." HURTADO said, "What color is the car?" MARTINEZ said, "Grey Dodge, it's a grey Dodge pick-up." CS-1 drove around the block with HURTADO. HURTADO said to CS-1, "He said my girl, my girl is at the gas station and there's a detective by her right now." HURTADO gave the CS-1 directions on where to turn. HURTADO said, "You got the (unintelligible) right?" CS-1 said, "Yeah, I got everything." HURTADO and CS-1 drove past the gas station where RODRIGUEZ was located. HURTADO, using the **Target Cell Phone,** called MARTINEZ and said, "Yeah, I seen her right there." MARTINEZ said, "You seen (unintelligible), you seen it, it's a big Dodge Ram." HURTADO responded in Spanish. MARTINEZ said, "Yeah, I'll be right there." HURTADO responded in Spanish. HURTADO asked the CS-1, "You just want to meet on the North side?" CS-1 said, "Shit whatever." HURTADO said, "Hey, hey, just come get me." MARTINEZ said, "Okay." HURTADO said, "Fuck man, you know the Northside, you know where." HURTADO exited CS-1's vehicle.

20.    At approximately 1:05 p.m., CS-1 called HURTADO, on the **Target Cell Phone,** and said, "Yo?" HURTADO asked, "What's happening?" HURTADO said, "I'm just, I'm just waiting on my girl to come pick me up real quick, I'm just walking down the street, cause he just said he seen them over there you know what I'm saying, they turned, but still you never fucking know." CS-1 said, "Right, hell no, shit." HURTADO said, "Hell no, give me like five minutes, and I'll call you." CS-1 said, "Alright." HURTADO said, "Okay." At approximately 1:11 p.m. HURTADO telephoned CS-1 via Facetime and CS-1 said, "Yo." HURTADO said, "Wait til three o'clock and I'll meet you over here." CS-1 asked, "You said wat til three?" HURTADO said, "Yeah." CS-1 said, "Alright." HURTADO said, "Okay."

21.    Case agents believe through their training and experience, MARTINEZ called HURTADO on the **Target Cell Phone** to warn him law enforcement was in the area and potentially following RODRIGUEZ and MARTINEZ.  Case agents further believe that this caused HURTADO to leave CS-1's car and temporarily call the deal off for fear that law enforcement would witness the exchange of cocaine and U.S.C.

22.    At approximately 7:00 p.m. HURTADO, using the **Target Cell Phone**, Facetimed CS-1 and instructed CS-1 to meet him at the intersection of Lasalle and Douglas on the north side of Racine to pick up the nine ounces of cocaine from HURTADO.  HURTADO instructed CS-1 to get into the passenger seat of HURTADO's truck.  HURTADO retrieved the cocaine from the center console of the truck and handed the cocaine to CS-1.

23.    CS-1 met with law enforcement at approximately 8:20 p.m. at a pre-determined location and turned the cocaine over to law enforcement. The narcotics field tested positive for cocaine and fentanyl and had a total package weight of 317.3 grams.

**March 15, 2024, Controlled Narcotics Purchase from HURTADO**

24.     On March 14, 2024, CS-1, at the direction of law enforcement, sent the following text message to the **Target Cell Phone**: "Yo I'm about ready for you." CS-1 texted, "Yo." HURTADO (believed to be using the **Target Cell Phone**) texted, "Yo." CS-1 texted, "When can I see you." HURTADO texted, "In the am." CS-1 texted, "Bet."

25.     On March 15, 2024, at approximately 9:57 a.m., CS-1, at the direction of law enforcement, sent the following text message to the **Target Cell Phone**:, "Yo." HURTADO (believed to be using the **Target Cell Phone**) texted, "Yo." CS-1 texted, "What it look like?" HURTADO texted, "Give me like 45 minutes."

26.     On March 15, 2024, at approximately 11:41 a.m., CS-1 met with law enforcement to conduct a controlled narcotics purchase from HURTADO. Law enforcement met CS-1 at a predetermined location and equipped CS-1 with audio and video recording equipment. HURTADO, using the **Target Cell Phone**, attempted to Facetime CS-1 while law enforcement was activating the audio video equipment, but CS-1 did not answer.

27.     At approximately 11:42 a.m. CS-1 exited law enforcement's covert vehicle, entered CS-1's vehicle, and placed a Facetime call to HURTADO on the **Target Cell Phone**. When HURTADO did not answer, CS-1 departed the staging area.  At approximately 11:43 a.m., HURTADO, using the **Target Cell Phone**, called CS-1 via Facetime.  During the call, HURTADO asked, "Hello how long before you get here?" CS-1 said, "Shit, I'll be there in a couple of minutes." HURTADO said, "Okay, I'll be there in five." CS-1 said, "Bet."

28.     At approximately 11:51 a.m., HURTADO arrived on Prospect Avenue and parked his white GMC Sierra Denali, bearing WI license plate TK2745, in front of CS-1's vehicle on the south side of the street.  CS-1 exited the driver's side of CS-1's vehicle, walked over to HURTADO'S vehicle, and entered the front passenger side.  HURTADO asked, "What's up with

you?" CS-1 said, "Just chilling man." HURTADO said, "Man I got hash right now man, I don't smoke weed." CS-1 said, "Uh yeah, I'm back on the weed too, you ain't got none?" HURTADO handed CS-1 suspected crack cocaine. HURTADO said, "That' um, that's a split, but we said at 5, so uh 2,500 at that, what's in here, 3?" CS-1 said, "Yeah, um it's all good." HURTADO said, "Hey um, I have some more tomorrow so you let me know." CS-1 said, "Alright bet." HURTADO asked, "Hey, um, you crashed?" CS-1 said, "Yeah, yeah, he hit my bumper, (unintelligible)." HURTADO asked, "You hit somebody?" CS-1 said, "Hell yeah." HURTADO said, "Alright haha I'll holler at you my nigga, be good." CS-1 said, "Love my boy." At approximately 11:53 a.m. CS-1 exited HURTADO's vehicle and entered CS-1's vehicle. CS-1 departed the location for the staging area.

29.     At approximately 11:58 a.m., CS-1 arrived at the predetermined staging location and the audio and video equipment was deactivated and the suspected narcotics were handed over to law enforcement. The narcotics field tested positive for cocaine and fentanyl and had a total package weight of 168.5 grams.

**April 6, 2024, Controlled Narcotics Purchase from HURTADO**

30.     On April 6, 2024, at approximately 4:30 p.m., CS-1 met law enforcement at a pre-determined location to prepare for another controlled narcotics purchase from HURTADO. Law enforcement searched CS-1 for contraband and currency, yielding negative results. They also equipped CS-1 with audio and video-recording equipment. CS-1 subsequently traveled to a residence where he/she would contact HURTADO to arrange a narcotics transaction. HURTADO had wanted CS-1 to show him CS-1's residence through Facetime. At approximately 4:42 p.m., CS-1 arrived at the residence and entered. Law enforcement was nearby conducting surveillance.

31.     At approximately 4:43 p.m., CS-1 sent the following text message to the **Target Cell Phone**, "Yo need you, hit me, you gone be around today or no?"  HURTADO texted, "I'll be back in bit for sure, like 45 minutes."  At approximately 5:41 p.m., HURTADO, using the **Target Cell Phone,** inquired by text if CS-1 was "Ready."  At approximately 5:44 p.m., CS-1 exited the residence and departed the location in CS-1's vehicle.  CS-1 informed law enforcement that CS-1 was traveling to Prospect Avenue in Racine, Wisconsin where CS-1 and HURTADO had conducted their previous narcotics transaction.

32.     At approximately 5:48 p.m., HURTADO, using the **Target Cell Phone**, called CS-1 via Facetime.  During the call, HURTADO asked, "Where you at?" CS-1 replied, "Shit, I'm 'bout pulling up right now." HURTADO said, "Shit, no fuck, I'm right here, I forgot to tell you, at the car wash on Memorial and what is this Rapids…" CS-1 asked, "Yeah, the car wash on Memorial and Rapids?" CS-1 then asked, "You talking about the little pull in one?" HURTADO replied, "Yeah, right there, I'm right here on the end, cause I'm…I got a bunch of mud in the truck I'm going to take that shit…"   CS-1 said, "Alright, alright, here I come." HURTADO responded, "Okay."

33.     Law enforcement, who was conducting physical surveillance, drove to National Pride Rapids Drive, Racine, Wisconsin, and observed HURTADO's white in color GMC Sierra Denali pickup truck, WI license plate TK2745.

34.     At approximately 5:52 p.m., CS-1 arrived at the National Pride car wash at 1508 Rapids Drive, Racine, Wisconsin.  CS-1 exited CS-1's vehicle and entered the front passenger seat of HURTADO'S pickup, which had previously arrived at the location.  HURTADO directed CS-1 to look inside the pickup's center console and said, "It should be in there, is it in there?" HURTADO then said, "Oh that's right, it's up here, right," and then reached up to retrieve the

suspected cocaine from the sun visor. After CS-1 gave HURTADO $3,500 in pre-recorded funds, HURTADO gave CS-1 a plastic bag containing the suspected cocaine. HURTADO said, "Hit me my nigga." CS-1 responded, "You already know." Following the controlled buy, CS-1 returned to the predetermined staging location and provided law enforcement the suspected narcotics, which field tested positive for cocaine and fentanyl and had a total package weight of 159.7 grams.

**Electronic and Physical Surveillance Conducted by Law Enforcement**

35.     On March 26, 2024, the Honorable Nancy Joseph, United States Magistrate Judge, authorized a warrant to place a tracking device on HURTADO's pickup for a period of 45 days. On April 4, 2024, the Honorable Nancy Joseph, United States Magistrate Judge, authorized a search warrant to obtain location data from the **Target Cell Phone** for a period of 30 days. Both electronic tracking and physical surveillance indicated that the **Target Cell Phone** and HURTADO's pickup were still being used in connection with drug-trafficking activity. For instance, on April 17, 2024, at approximately 5:51 p.m., tracking data on HURTADO's pickup and location data from the **Target Cell Phone** indicated they were in the vicinity of Prospect Avenue in Racine, Wisconsin. Investigators subsequently observed, near Prospect Avenue, HURTADO's pickup near a black Chevrolet sedan. An unidentified individual exited the black Chevrolet sedan and entered the passenger side of HURTADO's pickup. A short time later, the unidentified individual exited HURTADO's pickup and re-entered the black Chevrolet sedan. Soon thereafter, both HURTADO's pickup and black Chevrolet sedan left the Prospect Avenue area. Based on training, experience, and knowledge of the case, your affiant believes the brief meeting between the unidentified individual and the occupant of HURTADO's pickup, believed to be HURTADO, was a hand-to-hand narcotics transaction.

## CONCLUSION

36.    HURTADO operates the **Target Cell Phone**. The location data associated with the **Target Cell Phone** will assist law enforcement in conducting targeted physical surveillance to locate, surveil, and potentially arrest HURTADO.

37.    Case agents searched law enforcement databases to confirm that the **Target Cell Phone** is currently being serviced by Verizon Wireless.

38.    Case agents are requesting this warrant authorizing the further collection of data related to the **Target Cell Phone** for **30** days to enable case agents to monitor the **Target Cell Phone's** location, which will assist case agents in identifying HURTADO's source(s) of supply, points of distribution, and other locations associated with his drug-trafficking activity. Furthermore, the **Target Cell Phone's** location data will assist case agents in locating HURTADO should case agents decide to arrest HURTADO for violations of the federal controlled-substances laws.

39.    In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to

a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

40.    Based on my training and experience, I know that Verizon Wireless can also collect timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

<u>**Cell-Site Data**</u>

41.    Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers, such as the Service Provider, typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

42.    Based on my training and experience, I know that Verizon Wireless also can collect per-call measurement data, which Verizon Wireless also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## E-911 Phase II / GPS Location Data

43.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

## Subscriber Information

44.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their

subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone's** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

45.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

46.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

47.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.   The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

48.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **180 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to change patterns of behavior and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

49. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned call number **(262) 301-1034** (referred to herein and in Attachment B as "**Target Cell Phone**"), LUCIA RODRIGUEZ at 2626 Maple Grove Ave, Racine , Wisconsin (WI) 53404, known to be used by ARMANDO HURTADO, that is in the custody or control of Verizon Wireless, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, New Jersey (NJ) 07921.

2.      **The Target Cell Phone**.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period January 1, 2024, to the present:

      i.      Names (including subscriber names, usernames, and screen names);

      ii.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii.      Local and long-distance telephone connection records;

      iv.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

      v.      Length of service (including start date) and types of service utilized;

      vi.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

      vii.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.     Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.     All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period July 1, 2023, to the present including:

    a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b.     Information associated with each communication to and from the Target Cell Phone for a period of **30** days from the date of this warrant, including:

i.     Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.     Source and destination telephone numbers;

iii.     Date, time, and duration of communication; and

iv.     All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c.     Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

i.     To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location

Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.    This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b), involving ARMANDO HURTADO and other unknown persons prospectively for a period of 30 days from the date of this warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.